IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

CRISTINA CARABALLO,

Plaintiff,

v.

BACARDI CARIBBEAN CORP.,

Defendant.

CIVIL NO. 04-1889 (RLA)

**ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Plaintiff instituted these proceedings against BACARDI CARIBBEAN CORP. ("BACARDI") alleging sex discrimination in employment in violation of Title VII of the Civil Rights Act and various local provisions under our supplemental jurisdiction. Specifically, plaintiff claims that she was subjected to a hostile working environment and that defendant retaliated against her for having complained of sexual harassment.

Defendant has moved for summary judgment seeking the dismissal of the Title VII causes of action arguing that: (1) they are time-barred because plaintiff did not file the complaint within the statutory 90-day period; (2) we lack jurisdiction over any events occurring outside the 300-day period for filing the administrative charge; (3) plaintiff failed in her prima facie presentation of her hostile environment cause of action; (4) plaintiff did not establish

a prima facie case of retaliation and (5) defendant has legitimate non-discriminatory reasons for plaintiff's termination.

Additionally, defendant has moved for dismissal of the claim for unjust termination asserted under Law No. 80 of May 30, 1976, 29 P.R. Laws Ann. §§ 185a-185k (2002) ("Law 80").

The Court having reviewed the legal arguments proffered by the parties as well as the evidence submitted in support of their respective positions hereby rules as follows.

## I. FACTUAL BACKGROUND

BACARDI is a corporation duly authorized to do business in Puerto Rico dedicated to the manufacture, distribution, marketing and sale of rum products.

Plaintiff commenced working with BACARDI in August 1998. During her tenure with BACARDI plaintiff occupied the position of Brand Manager of several of BACARDI products including "Bacardi Limon".

As Brand Manager, plaintiff was in charge of coordinating the marketing strategy of specific products and brands that were manufactured and sold by BACARDI for which she was responsible. Specifically, plaintiff had the responsibility of planning and structuring a strategy to follow with regards to the marketing of a brand which included its price, publicity, and target market.

"Bacardi Limon" was the most important product manufactured by BACARDI under plaintiff's command and responsibility.

Effective June 1, 2002, JAVIER VIERA, who had occupied a Brand Manager position since August 1, 2000, was promoted by Marketing Director JAVIER CARRO to Category Manager. After his promotion, VIERA became plaintiff's immediate supervisor. The Category Manager position was created as an intermediate position between the Marketing Director and the Brand Managers.

JAVIER CARRO held the Marketing Director position for BACARDI during 2000-2001 acting as plaintiff and VIERA's immediate supervisor. CARRO ceased working for BACARDI in February 2001 whereupon MANUEL MUCHACHO was named Marketing Director from February 2001 to March 2002 thereby directly supervising plaintiff and VIERA during that period of time. After MUCHACHO's departure, CARRO returned as Marketing Director in February 2002.

Via a May 31, 2002 letter, plaintiff was advised that due to the fact that her past evaluations were below company expectations she would be placed on a three-month improvement plan. Absent compliance therewith, plaintiff would be separated from BACARDI. Plaintiff satisfactory complied with the performance improvement plan.

In early 2002, BACARDI needed to launch a promotional program for the "Bacardi Limon" brand which was under plaintiff's command. Plaintiff commissioned this project to EMPIRE ENTERTAINMENT ("EMPIRE"). Some time between March and the summer of 2002 EMPIRE developed the idea of "Bacardi Limon Drums" and presented the promotional program to plaintiff. The graphics of the promotional

program consisted of various bottles of "Bacardi Limon" simulating a group of drums, which would be filled with water in different colors, with each bottle making a different and distinct noise. EMPIRE's project was initially approved but was eventually cancelled in November 2002.

After the cancellation of EMPIRE's project, BACARDI identified the need to develop an "on-premise" promotional program of the "Bacardi Limon" product in bars throughout Puerto Rico. Plaintiff was approached by the BACARDI's Promotions Department for the creation of this promotional program for the approaching Christmas season.

Plaintiff submitted EMPIRE's "Bacardi Limon Drums" design and concept to the BACARDI's Promotions Department. It was then adapted to an "on-premise" concept rather than the "image" promotion for which it was initially designed. The idea of using EMPIRE's promotional program came directly from plaintiff.

BACARDI ran and implemented the "Bacardi Limon Drums" promotional campaign using the same creative concept, ideas and label suggested by EMPIRE.

During the first week of December 2002, CARLOS COBIAN, EMPIRE's Marketing Director, informed CARRO that BACARDI was using its promotional idea and concept without its consent. MR. COBIAN submitted the documents evidencing that the "Bacardi Limon Drums" program had been developed by EMPIRE.

In December 2002, COBIAN informed CARRO that plaintiff had approached INGRID SEGARRA, an EMPIRE's employee, requesting that she produce and run future BACARDI events on a freelance basis.

On December 9, 2002, CARRO, VIERA and BACARDI's Human Resources consultant met with plaintiff and informed her of her termination from employment due to her unethical conduct based on the unauthorized use of EMPIRE's "Bacardi Limon Drums" concept and for having tried to contract the extra-official services of an EMPIRE employee.

Plaintiff filed a charge with the Anti-Discrimination Unit of the P.R. Department of Labor and Human Resources ("ADU") on August 27, 2003. Plaintiff's complaint filed before the ADU was transferred to the Equal Employment Opportunity Commission ("EEOC") on March 24, 2004. The EEOC issued and mailed its Notice of Right-to-Sue on May 24, 2004. The complaint in this case was filed on August 27, 2004.

**II. SUMMARY JUDGMENT STANDARD**

Rule 56(c) Fed. R. Civ. P., which sets forth the standard for ruling on summary judgment motions, in pertinent part provides that they shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Sands v. Ridefilm Corp., 212 F.3d 657, 660-61 (1st

Cir. 2000); Barreto-Rivera v. Medina-Vargas, 168 F.3d 42, 45 (1st Cir. 1999). The party seeking summary judgment must first demonstrate the absence of a genuine issue of material fact in the record. DeNovellis v. Shalala, 124 F.3d 298, 306 (1st Cir. 1997). A genuine issue exists if there is sufficient evidence supporting the claimed factual disputes to require a trial. Morris v. Gov't Dev. Bank of Puerto Rico, 27 F.3d 746, 748 (1st Cir. 1994); LeBlanc v. Great Am. Ins. Co., 6 F.3d 836, 841 (1st Cir. 1993), *cert. denied*, 511 U.S. 1018, 114 S.Ct. 1398, 128 L.Ed.2d 72 (1994). A fact is material if it might affect the outcome of a lawsuit under the governing law. Morrissey v. Boston Five Cents Sav. Bank, 54 F.3d 27, 31 (1st Cir. 1995).

"In ruling on a motion for summary judgment, the court must view 'the facts in the light most favorable to the non-moving party, drawing all reasonable inferences in that party's favor.'" Poulis-Minott v. Smith, 388 F.3d 354, 361 (1st Cir. 2004) (citing Barbour v. Dynamics Research Corp., 63 F.3d 32, 36 (1st Cir. 1995)).

Credibility issues fall outside the scope of summary judgment. "'Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge.'" Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). *See also*, Dominguez-Cruz v. Suttle Caribe,

Inc., 202 F.3d 424, 432 (1st Cir. 2000) ("court should not engage in credibility assessments."); Simas v. First Citizens' Fed. Credit Union, 170 F.3d 37, 49 (1st Cir. 1999) ("credibility determinations are for the factfinder at trial, not for the court at summary judgment."); Perez-Trujillo v. Volvo Car Corp., 137 F.3d 50, 54 (1st Cir. 1998) (credibility issues not proper on summary judgment); Molina Quintero v. Caribe G.E. Power Breakers, Inc., 234 F.Supp.2d 108, 113 (D.P.R. 2002). "There is no room for credibility determinations, no room for the measured weighing of conflicting evidence such as the trial process entails, and no room for the judge to superimpose his own ideas of probability and likelihood. In fact, only if the record, viewed in this manner and without regard to credibility determinations, reveals no genuine issue as to any material fact may the court enter summary judgment." Cruz-Baez v. Negron-Irizarry, 360 F.Supp.2d 326, 332 (D.P.R. 2005) (internal citations, brackets and quotation marks omitted).

In cases where the non-movant party bears the ultimate burden of proof, he must present definite and competent evidence to rebut a motion for summary judgment, Anderson v. Liberty Lobby, Inc., 477 U.S. at 256-257, 106 S.Ct. 2505, 91 L.Ed.2d 202; Navarro v. Pfizer Corp., 261 F.3d 90, 94 (1st Cir. 2000); Grant's Dairy v. Comm'r of Maine Dep't of Agric., 232 F.3d 8, 14 (1st Cir. 2000), and cannot rely upon "conclusory allegations, improbable inferences, and unsupported speculation". Lopez-Carrasquillo v. Rubianes, 230 F.3d 409, 412 (1st

Cir. 2000); Maldonado-Denis v. Castillo-Rodríguez, 23 F.3d 576, 581 (1st Cir. 1994); Medina-Muñoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8 (1st Cir. 1990).

Further, any testimony used in a motion for summary judgment setting must be admissible in evidence, i.e., based on personal knowledge and otherwise not contravening evidentiary principles. Rule 56(e) specifically mandates that affidavits submitted in conjunction with the summary judgment mechanism must "be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein." Hoffman v. Applicators Sales and Serv., Inc., 439 F.3d 9, 16 (1st Cir. 2006); Carmona v. Toledo, 215 F.3d 124, 131 (1st Cir. 2000). *See also*, Quiñones v. Buick, 436 F.3d 284, 290 (1st Cir. 2006) (affidavit inadmissible given plaintiff's failure to cite "supporting evidence to which he could testify in court"). The affidavit must contain facts which are admissible in evidence. Lopez-Carrasquillo v. Rubianes, 230 F.3d at 414. "Evidence that is inadmissible at trial, such as inadmissible hearsay, may not be considered on summary judgment." Vazquez v. Lopez-Rosario, 134 F.3d 28, 33 (1st Cir. 1998).

**III. TITLE VII - EXHAUSTION OF REMEDIES**

Prior to resorting to the courts for relief, plaintiffs must present their discrimination claims under Title VII to the appropriate agency. "In light of the statutory scheme, it is

unsurprising that, in a Title VII case, a plaintiff's unexcused failure to exhaust administrative remedies effectively bars the courthouse door." Jorge v. Rumsfeld, 404 F.3d 556, 564 (1st Cir. 2005). "In order to prosecute a [Title VII] claim... an aggrieved party must first file a timely administrative complaint." Noviello v. City of Boston, 398 F.3d 76, 85 (1st Cir. 2005). "[P]laintiffs [may] not proceed under Title VII without first exhausting administrative remedies." Lebron-Rios v. U.S. Marshal Service, 341 F.3d 7, 13 (1st Cir. 2003); Bonilla, 194 F.3d at 275. "Title VII requires that an aggrieved individual exhaust his or her administrative remedies as a prerequisite to filing suit in federal court." Dressler v. Daniel, 315 F.3d 75, 78 (1st Cir. 2003). "Title VII requires, as a predicate to a civil action, that the complainant first file an administrative charge with the EEOC within a specified and relatively short time period (usually 180 or 300 days) after the discrimination complained of". Clockedile v. New Hampshire Dept. of Corrections, 245 F.3d 1, 3 (1st Cir. 2001).

The purpose behind the exhaustion requirement is to give the employer timely notice of the events as well as provide an opportunity for an early amicable resolution of the controversy. "That purpose would be frustrated... if the employee were permitted to allege one thing in the administrative charge and later allege something entirely different in a subsequent civil action." Lattimore v. Polaroid Corp., 99 F.3d 454, 464 (1st Cir. 1996).

In Puerto Rico, an aggrieved employee has 300 days from the occurrence of the employment action complained of to file an administrative charge in instances where the local Department of Labor is empowered to provide relief, i.e., in instances of "deferral" jurisdiction. Bonilla, 194 F.3d at 278 n.4; Lebron-Rios, 341 F.3d 7, 11 n.5 (1st Cir. 2003). Otherwise, the applicable period is 180 days. *See*, 42 U.S.C. § 2000e-5(e)(1).[1]

However, "[the Title VII] charge-filing requirement is mandatory but not jurisdictional; therefore, it is subject to a host of equitable exceptions." Jorge v. Rumsfeld, 404 F.3d at 565. *See also*, McKinnon, 83 F.3d 498, 505 (1st Cir. 1996) (charging requirement not jurisdictional and subject to exceptions).

---

[1] In pertinent part, § 2000e-5(e)(1) reads:

> A charge under this section shall be filed within **one hundred and eighty days** after the alleged unlawful employment practice occurred... except that in a case of an unlawful employment practice with respect to which the person aggrieved has initially instituted proceedings with a state or local agency with authority to grant or seek relief from such practice or to institute criminal proceedings with respect thereto... such charge shall be filed by or on behalf of the person aggrieved within **three hundred days** after the alleged unlawful employment practice occurred.

(Emphasis ours).

**A. 90 Days**

Pursuant to 42 U.S.C. § 2000e-5(f)(1), an aggrieved individual must institute civil proceedings within 90 days from receipt of the Right-to-Sue notice issued by the pertinent government agency.

"Title VII requires, as a predicate to a civil action, that the complainant first file an administrative charge with the EEOC within a specified and relatively short time period (usually 180 or 300 days) after the discrimination complained of... and that the lawsuit be brought within an even shorter period (90 days) after notice that the administrative charge is dismissed or after the agency instead issues a right-to-sue letter." Clockedile, 245 F.3d at 3. "A Title VII claimant may sue only after the EEOC issues a right-to-sue letter... Once such a letter is received, the claimant must file her suit within ninety days." Noviello, 398 F.3d at 85. "The 90-day filing rule is not a jurisdictional prerequisite to suit in federal court, but rather a requirement that, like a statute of limitations, is subject to waiver, estoppel, and equitable tolling." Holmes v. NBC/GE, 914 F.Supp. 1040, 1042 (S.D.N.Y. 1996) (citations and internal quotation marks omitted).

In this case the parties agree that the EEOC's Notice of Right-to-Sue letter was mailed on May 24, 2004, the date it was postmarked. Defendant contends that because plaintiff did not recall during her deposition the particular date when she received the letter we must apply the three-day additional term provided for in Rule 6(e) Fed. R.

Civ. P. for documents served by mail and assume May 27, 2004 was the receipt date. *See*, Sanchez Ramos v. P.R. Police Dep't, 392 F.Supp.2d 167 (D.P.R. 2005). Defendant concludes that, inasmuch as plaintiff filed her complaint on August 27, 2004, the suit is untimely by 2 days.

Defendant further contends that we must discard plaintiff's version as to when she received the notice submitted in response to the summary judgment request as contrary to her previous deposition testimony.

"It is settled that '[w]hen an interested witness has given clear answers to unambiguous questions, he cannot create a conflict and resist summary judgment with an affidavit that is clearly contradictory, but does not give a satisfactory explanation of why the testimony is changed.'" Torres v. E.I. Dupont de Nemours & Co., 219 F.3d 13, 20 (1st Cir. 2000) (citing Colantuoni v. Alfred Calcagni & Sons, Inc., 44 F.3d 1, 4-5 (1st Cir. 1994)); Sailor Inc. F/V v. City of Rockland, 324 F.Supp.2d 197, 202 (D.Me. 2004).

The timing of the recanting, i.e., in response to a summary judgment request has been held crucial as well as whether or not a satisfactory explanation for the change in testimony has been provided. Colantuoni, 44 F.3d at 5. *See i.e.*, Torres, 219 F.3d at 20-21 ("post-summary judgment affidavit... does not indicate that there was any confusion at the time of his deposition testimony... nor does it allege that the prior testimony was in error.").

In Orta-Castro v. Merck, Sharp & Dohme Quimica P.R., Inc., 447 F.3d 105, 110 (1st Cir. 2006) the Court of Appeals affirmed the District Court's disregard of an affidavit filed in opposition to a summary judgment request as "an attempt to manufacture an issue of fact in order to survive summary judgment." Plaintiff's explanation that she had memory problems was rejected inasmuch as this concern had never before been brought up to the attention of opposing counsel despite the fact that plaintiff had been deposed on two prior occasions.

In her opposition to the summary judgment request filed in these proceedings plaintiff submitted an affidavit indicating that she had indeed received the Right-to-Sue letter on May 31, 2004,[2] which would make her complaint timely. In her sworn statement plaintiff explained that she had opened the envelope in the presence of Rafael Rivera and had proceeded to deliver the same to her attorney's office on that same date. This version is corroborated by Mr. Rivera's sworn statement. Additionally, the attorney's secretary vouched for the fact that the letter had been delivered to her on May 31, 2004. Lastly, it must be noted that the complaint filed in this case specifically states that the letter was received on May 31, 2004.

Further, plaintiff did indicate in her deposition that she took the letter to her counsel "the same day [she] received it." [Tr. 180]. Therefore, her testimony now is consonant with the factual

[2] This date fell on a Monday.

version in her deposition; it merely provides further details. The additional evidence submitted in opposition to the summary judgment adequately supports plaintiff's version and distinguishes the circumstances present in this case from those in Orta.

Additionally, a seven-day delay in mail delivery has been found reasonable in cases assessing compliance with the 90-day deadline. Roush v. Kartridge Pak Co., 838 F.Supp. 1328 (S.D. Iowa 1993). *See also*, Holmes v. NBC/GE, 914 F.Supp. 1040 (S.D.N.Y. 1996) (determining that five days is not an unreasonable term for mail to travel from one New York City borough to another).

**B. 300 Days - Harassment v. Retaliation**

Plaintiff filed her discrimination charge with the ADU on **August 27, 2003.** Plaintiff's complaint was transferred by ADU to the EEOC on March 24, 2004. The EEOC mailed its Notice of Right-to-Sue on May 24, 2004 thereby concluding its investigation of plaintiff's discrimination claim. According to defendant, all of the allegedly discriminatory events which transpired before **October 31, 2002**, i.e., 300 days prior to instituting this action on August 27, 2003, are time-barred.

For purposes of the limitations period we must distinguish between discrete discriminatory and retaliatory practices such as terminations, failure to promote, and transfers each of which is independently actionable from hostile work environment claims which are typically comprised of a series of events which take place over

a period of time. Hence, claims based on discrete discriminatory acts will accrue at the time of the unlawful conduct whereas in hostile work environment claims "the statute of limitations 'will not exclude acts that are part of the same unlawful employment practice if at least one act falls within the time period.'" Ruiz-Susona v. Univ. of Puerto Rico, 334 F.3d 157, 160 (1st Cir. 2003) (citing Dressler v. Daniel, 315 F.3d 75, 79 (1st Cir. 2003)).

Hostile environment claims involve repeated conduct which extends over a period of time and "therefore cannot be said to occur on any particular day" in contrast to discrete discriminatory acts. Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 115, 122 S.Ct. 2061, 2073, 153 L.Ed.2d 106, 123 (2002). *See also*, Lee-Crespo, 354 F.3d at 44 (difference between "[e]xplicit alterations - that is, tangible employment actions" and a sequence of events that are so severe or pervasive that alter the conditions of employment and which collectively are deemed a single wrongful practice.); *See also*, Goya, 304 F.3d at 18 (distinction between "hostile work environment claims and claims involving discrete acts of discrimination or retaliation, such as a discharge, failure to promote, denial of transfer, or refusal to rehire.")

For limitations purposes, an initial harassment and subsequent retaliation are ordinarily "two separate and independent harms" and "not sufficiently related" to be considered "a single continuing violation." Noviello, 398 F.3d at 87. This is because in most cases

there is a "disparity" of the underlying motives behind sexual harassment and retaliation provoked by complaints of such conduct.

> Most often, retaliation is a distinct and independent act of discrimination, motivated by a discrete intention to punish a person who has rocked the boat by complaining about an unlawful employment practice. That is a different animus than the sexual animus that drove the original harassment.

*Id.* (citations omitted).

Hence, we must proceed to examine the nature of the allegations in this case in order to ascertain which particular conduct falls within the harassment ambit and which charges retaliatory conduct instead.

Plaintiff alleges that during her tenure with BACARDI she was subjected to JAVIER VIERA's undesired comments and conduct which constituted sexual harassment. Plaintiff further claims that a performance memorandum dated May 31, 2002, placing her on probationary status as well as her subsequent discharge on December 9, 2002, were taken in retaliation for having complained to her supervisors about VIERA's discriminatory actions.

Based on the foregoing it is evident that according to plaintiff, two of the actions complained of, i.e., the probation letter and her termination were motivated by defendant's desire to penalize her for having complained of sexual harassment. Because

these two constitute discrete discriminatory events any retaliation claim accrued on those particular dates.

Inasmuch as plaintiff's ADU charge was filed on August 27, 2003, the retaliation claim based on the probation memorandum issued on May 31, 2002 falls outside the 300-day limit. Thus, the retaliation claim premised on this event is untimely.[3]

On the other hand, events occurring prior to October 31, 2003, which constitute part of the allegedly hostile environment conduct are not time-barred.

**IV. TITLE VII - HOSTILE WORK ENVIRONMENT**

Defendant argues that plaintiff has failed to adequately present a prima facie case of sexual harassment.

Sex discrimination also encompasses sexual harassment in the work setting. Depending on the circumstances, harassment may turn into a hostile work environment or a *quid pro quo* situation. "Sexual harassment, whether by means of a co-worker's demands for sexual favors as a '*quid pro quo*' or by the employer's creation or tolerance of a hostile and abusive work environment, constitutes discrimination prohibited by Title VII." Gorski v. New Hampshire Dep't of Corrections, 290 F.3d 466, 472 (1st Cir. 2002).

The protection against discrimination in employment based on sex provided by Title VII of the Civil Rights Act of 1964, 42 U.S.C.

---

[3] There is no controversy over the fact that plaintiff's retaliation claim based on her December 9, 2002 termination falls within the 300-day limit.

§ 2000e-2(a)(1) has been expanded to areas beyond strictly "economic" and "tangible discrimination" to situations where "sexual harassment is so severe or pervasive as to alter the condition of the victim's employment and create an abusive working environment." Faragher v. City of Boca Raton, 524 U.S. 775, 786, 118 S.Ct. 2275, 2283, 141 L.Ed.2d 662, 675 (1998) (citations, internal quotation marks and brackets omitted); Harris v. Forklift Sys., Inc., 510 U.S. 17, 21, 114 S.Ct. 367, 370, 126 L.Ed.2d 295, 302 (1993); Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 67, 106 S.Ct. 2399, 2404-05, 91 L.Ed.2d 49, 60 (1986); Torres-Negron v. Merck & Co., Inc., 488 F.3d 34, 39 (1st Cir. 2007); Pomales v. Celulares Telefonica, Inc., 447 F.3d 79, 83 (1st Cir. 2006); Valentin-Almeyda v. Municipality of Aguadilla, 447 F.3d 85, 94 (1st Cir. 2006); Noviello, 398 F.3d at 92.

Thus, even absent a tangible employment action, an employee may successfully assert a sex discrimination action under Title VII if the degree of the harassment is such that it is deemed to have altered the plaintiff's terms and conditions of employment. Fontanez-Nuñez v. Janssen Ortho LLC, 447 F.3d 50, 56 (1st Cir. 2006).

It is imperative to keep in mind that Title VII protects against discrimination "because of" sex. Therefore, the acts complained of must be motivated by plaintiff's sex. "What *is* essential is proof that the work environment was so hostile or abusive, because of conduct based on one of the prohibited factors identified in Title

VII, that the terms or conditions of the plaintiff's employment were caused to be altered." Gorski, 290 F.3d at 472.

Ascertaining which particular conduct falls within the "severe or pervasive" realm in order to trigger Title VII protection is no easy task. "'There is no mathematically precise test to determine whether a plaintiff presented sufficient evidence' that she was subjected to a severely or pervasively hostile work environment." Pomales, 447 F.3d at 83 (citing Kosereis v. Rhode Island, 331 F.3d 207, 216 (1st Cir. 2003)) (internal brackets omitted); Gorski, 290 F.3d at 472.

However, "in order to be actionable under the statute, a sexually objectionable environment must be both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so." Faragher, 524 U.S. at 787, 118 S.Ct. at 2283, 141 L.Ed.2d at 676; Pomales, 447 F.3d at 83; Noviello, 398 F.3d at 92.

The Court will examine the totality of the circumstances to determine whether the degree of the hostile or abusive environment the employee is subjected to is intense enough to fit within Title VII protection. Faragher, 524 U.S. at 787, 118 S.Ct. at 2283, 141 L.Ed.2d at 676; Pomales, 447 F.3d at 83; Valentin-Almeyda, 447 F.3d at 94; Noviello, 398 F.3d at 92; Lee-Crespo v. Schering-Plough del Caribe, Inc., 354 F.3d 34, 46 (1st Cir. 2003); Che v. Mass. Bay Transp. Auth., 342 F.3d 31, 40 (1st Cir. 2003).

> [W]hether the environment is objectively hostile or abusive must be answered by reference to all the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance, and whether it unreasonably interferes with an employee's work performance.

Marrero v. Goya de P.R., Inc., 304 F.3d 7, 18-19 (1st Cir. 2002) (citing Harris, 510 U.S. at 21, 114 S.Ct. at 370, 126 L.Ed.2d at 302 (internal citations omitted); Valentin-Almeyda, 447 F.3d at 94; Fontanez-Nuñez, 445 F.3d at 56; Noviello, 398 F.3d at 92; Lee-Crespo, 354 F.3d at 46; Che, 342 F.3d at 40; Gorski, 290 F.3d at 472; Conto v. Concord Hosp., Inc., 265 F.3d 79, 82 (1st Cir. 2001); O'Rourke v. City of Providence, 235 F.3d 713, 729 (1st Cir. 2001).

The First Circuit Court of Appeals summarized the elements plaintiff must prove in order to succeed in her hostile work environment claim as set forth by the Supreme Court. These are:

> (1) that she... is a member of a protected class; (2) that she was subjected to unwelcome sexual harassment; (3) that the harassment was based upon sex; (4) that the harassment was sufficiently severe or pervasive so as to alter the conditions of plaintiff's employment and create an abusive work environment; (5) that sexually objectionable conduct was both objectively and subjectively offensive, such that

> a reasonable person would find it hostile or abusive and the victim in fact did perceive it to be so; and (6) that some basis for employer liability has been established.

Torres-Negron, 488 F.3d at 39 (citing O'Rourke, 235 F.3d at 728).

"Although offhand remarks and isolated incidents are not enough, '[e]vidence of sexual remarks, innuendoes, ridicule and intimidation may be sufficient to support a jury verdict for hostile work environment.'" Valentin-Almeyda, 447 F.3d at 94 (citing O'Rourke, 235 F.3d at 729); Clark County Sch. Dist. v. Breeden, 532 U.S. 268, 271, 121 S.Ct. 1508, 1510, 149 L.Ed.2d 509, 511 (2001) (per curiam) (ordinarily isolated incidents will not be deemed to have haltered terms and conditions of employment unless they are extremely serious).

Usually an isolated sexual advance *per se* does not translate into an abusive workplace environment. *See i.e.*, Pomales, 447 F.3d at 83 (comment and gesture by supervisor suggesting he wanted to have sexual relations with plaintiff, albeit crude not sufficient because it "comprised only a single incident" where there was no evidence of the supervisor having either touched or physically threatened plaintiff) and also citing cases where the following not deemed sufficiently severe or pervasive under Title VII: five sexual advances by supervisor "highly doubtful"; "over a two-week period, a coworker stood behind the plaintiff to create physical contact, surreptitiously looked at the plaintiff's genitals in the restroom

and engaged in unwanted touching; "single battery and two offensive remarks over six months."

A hostile work environment may result from "sexual remarks, innuendoes, ridicule and intimidation ... disgusting comments" Goya, 304 F.3d at 19 (citations and internal quotations omitted) "unwelcome sexual advances or demands for sexual favors" Gorski, 290 F.3d at 472 (citations and internal quotations omitted) which are "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." O'Rourke, 235 F.3d at 728 (citations and quotation marks omitted). *See also*, Noviello, 398 F.3d at 84.

Courts must discern between "commonplace indignities typical of the workplace (such as tepid jokes, teasing, or aloofness... and severe or pervasive harassment... [and] [t]he thrust of this inquiry is to distinguish between the ordinary, if occasionally unpleasant, vicissitudes of the workplace and actual harassment." *Id* at 92. *See also*, Lee-Crespo, 354 F.3d at 37 (supervisor's conduct found "boorish and unprofessional" and plaintiff "subjected to incivility" "but... incidents... not severe or pervasive enough to alter the terms and conditions of [plaintiff's] employment").

In Fontanez-Nuñez, 447 F.3d at 57 the court found that a supervisor's "continued use of objectionable language and vulgar remarks" in plaintiff's presence which were often directed to employees in the area was not sufficiently severe or pervasive to be

actionable. The court further explained that "[w]hile the vulgar language was inappropriate to the workplace and completely unprofessional, mere offensive utterances that did not unreasonably interfere with the employee's work performance do not amount to harassment that in essence altered the terms or conditions of [plaintiff's] employment." *See also*, Gorski, 290 F.3d at 469-70 ("Sporadic use of abusive language does not create a hostile work environment because such conduct is not 'extreme' enough to alter the terms and conditions of employment.")

It is plaintiff's burden to establish the severity and pervasiveness of the harassment sufficient to alter the conditions of her employment. Conto, 265 F.3d at 82. In this particular case plaintiff must also present evidence that the harassment was based on plaintiff's gender. Lee-Crespo, 354 F.3d at 44 n.6.

Because this determination is "fact specific", Conto, 265 F.3d at 81, ordinarily "it is for the jury to weigh those factors and decide whether the harassment was of a kind or to a degree that a reasonable person would have felt that it affected the conditions of her employment." Goya, 304 F.3d at 19. *See also*, Che, 342 F.3d at 40 ("[a]s a general matter, these are questions best left for the jury"). However, "summary judgment is an appropriate vehicle for policing the baseline for hostile environment claims." Pomales, 447 F.3d at 83 (citation, internal quotation marks and brackets omitted).

Additionally, plaintiff must present evidence that the harassment altered the terms of her work. *See*, *id.* at 84 (nor did plaintiff "present[]... proof that [her supervisor's] conduct negatively affected her ability to work"); Lee-Crespo, 354 F.3d at 46 (plaintiff failed to introduce evidence that the acts complained of constituted "an impediment to [plaintiff's] work performance.")

**A. Deposition Testimony**

Defendant assails the admissibility of plaintiff's sworn statement used as basis for opposing the summary judgment request[4] arguing that "plaintiff merely added new allegations in her opposition that she did not mention during her deposition, and described for the first time the alleged harassing incidents as 'constant', 'frequent', 'severe', etc. She did so despite the fact that such categorizations are in direct conflict with her prior deposition testimony. This in order to encompass her sexual harassment claim within the 'frequent' and 'severe' elements necessary for a sexual harassment claim to survive; knowing that her deposition remarks could not fulfill such mission." (Reply, docket No. 33 p. 4.)

A comparison between plaintiff's deposition testimony and her sworn statement does not necessarily have to be completely

[4] Additionally, defendant attacks the formality of the document because the signature appears on a separate page. This was explained by plaintiff's counsel which indicated that in order to file the document it had to be divided into separate pages.

contradictory in order to disallow the submission of the latter. Deposition testimony should trump a subsequent sworn statement where vague and imprecise answers are given to direct, unambiguous questions on crucial issues. Sworn statements, which are not subject to cross-examination as in the case of depositions should not be permitted to unilaterally expand on crucial issues such as the severity or frequency of any particular act or function. Accordingly, the Court will limit its inquiry regarding plaintiff's hostile environment claim to her deposition testimony.

With respect to the frequency of the events plaintiff testified that she experienced "[s]everal, plenty" incidents of sexual harassment while working with BACARDI. [Tr. 65]. She specifically noted that she could not delimit a particular number of events [Tr. 67], "[m]ore than twenty times" [Tr. 67] and did not keep a logbook. [Tr. 65] She stated: "I don't have a number, that is, on repeated occasions, on different occasions." [Tr. 65].

The following summarizes the events cited by plaintiff as suggestive of a hostile environment claim by reason of her sex at her deposition based on VIERA'S conduct: (1) an incident at a hotel; (2) comments making reference to her breasts;(3) personal life; (4) comments regarding her figure and dress, (5) comments regarding her hair; and (6) insinuating that the matters addressed in her probation letter could be resolved if plaintiff paid attention to him.

In plaintiff's deposition she testified with respect to the frequency of episodes of alleged sexual harassment as follows.

**(1) Hotel**

According to plaintiff, an experience while on a work trip [prior to CARRO leaving in February 2001] was the most impacting to her and marked when the harassment essentially started [Tr. 67 & 68]. Even though there had been some prior events, these had not been as intense or as severe as those that occurred subsequent thereto. [Tr. 69].

Plaintiff narrated that both VIERA and she exited the elevator together, bade each other good night, and went to their respective rooms which were located on the same floor. After plaintiff had taken a bath and was ready to go to bed, VIERA knocked on her door, came in and "approached" plaintiff and started making "insinuations". VIERA asked plaintiff if she had "something in [her] bag" which she understood to mean if she had any alcohol with her since they used to bring alcohol for promotions. The visit lasted approximately 20 minutes. [Tr. 77]. Plaintiff explained that:

> He [VIERA] approached me to sit next to me and I felt uncomfortable and I went to the other corner of the bed because there is (sic) no furniture in a room.
>
> . . . .
>
> I moved away. I sat on the other corner of the headboard.

Tr. 79.

Plaintiff felt uncomfortable because she had expected the conversation to be about work and asked him to leave. [Tr. 74].

**(2) Breasts**

Plaintiff indicated that "the frequency of the remarks increased. These were made sometimes during a conversation, nothing, trivial in the hallway... sometimes [VIERA] said 'Yes, because there are good reasons to do that,' and he pointed to the chest as if my chest was bigger." [Tr. 79]. VIERA "made gestures with his hands" pointing to his chest. [Tr. 79-80].

These comments commenced shortly after returning from the trip, maybe a week or more later [Tr. 81] while MANUEL MUCHACHO was still the supervisor.

When asked regarding the frequency, after indicating that she could not be "specific" plaintiff responded that on that date she recalled "four or five times." [Tr. 81].

**(3) Personal Life**

Additionally, plaintiff noted that VIERA would inquire as to her personal life "[s]everal times... between four and eight times" that she could remember. [Tr. 81-82]. She explained the interlude as follows:

> He [VIERA] started "And are you happy?" Whether I was happy in my personal life, that my boyfriend was not enough man for me, that I had to get a better man. Another time that I remember of those several ones that he repeated the

> subject sometimes in company activities he insinuated or asked me to go along, not take anyone with me. Later at other times it was "You need a man perhaps like me, a person that values you and is what you need." At other times of the several occasions, that was behind closed doors, he says (sic) "You know that I am a happily married man, but if you get me with a couple of drinks I am not responsible."

Tr.82.

**(4) Dress**

On other occasions, referring to her figure, VIERA would remark in front of others "she dazzles us here, imagine, that doesn't fit in that dress." [Tr. 87]. When asked regarding the intensity and frequency of these comments, plaintiff responded "[s]everal times a week." [Tr. 87]. Upon her pointing out to co-workers that she had gained weight VIERA "seemed to get upset and could say 'Why do you always have to be talking like that. Every time you go by this hall way you dazzle everyone.'" [Tr. 97].

**(5) Hair**

Plaintiff further related that VIERA would "constantly" "continuously" ask her to let her hair down because that way she would look "sexier". [Tr. 69]. Plaintiff indicated that she could not specify the particular number of times this happened. [Tr. 69, 70 &

71]. The comments regarding plaintiff's hair continued on a frequent basis after VIERA was appointed as her supervisor. [Tr. 95].

**(6) Probation Letter**

According to plaintiff, the innuendoes continued after May 31, 2002 [when plaintiff was given a probationary letter], at which time VIERA told her "'Well, you know how we can resolve this. You have a disciplinary action, you know how we can resolve it.' Insinuating that I pay attention to his insinuations." [Tr. 114]. Plaintiff further testified that even though the most severe incidents took place while MUCHACHO was still in charge these continued after CARRO returned to BACARDI in February 2002. [Tr. 94-95]. Further, while VIERA was more careful after he was appointed to the supervisory position in March 2002, [Tr. 97] the comments regarding her hair, dazzling figure and that she was cold referring to her breasts continued. [Tr. 98].

Aside from VIERA's indiscretion in knocking on plaintiff's hotel door at a presumably late hour (the time is not specified) looking for alcohol and plaintiff, presumably in sleeping attire, nevertheless, permitted him to enter, the Court finds no evidence of sexual harassment. The fact that VIERA sat on the bed is of no great moment given there was no other furniture in the room. Plaintiff also states VIERA remained for 20 minutes, but, interestingly, the transcript is silent as to whether she ever requested his departure. With respect to plaintiff's testimony concerning VIERA alluding to

her breasts, personal life, dress and hair the Court finds these allegations do not sufficiently rise to the level of severity and pervasiveness so as to alter the conditions of plaintiff's employment. Rather, they fall in the category of boorishness, and teasing which while socially contemptible is not sufficiently intense to trigger Title VII protection. Furthermore, there is no evidence that VIERA's conduct, while vulgar and inappropriate unreasonably interfered with plaintiff's work performance.

With respect to the probationary letter event it should be noted that at no time has plaintiff complained of "quid pro quo" sexual harassment. In addition, the comment is vague and requires a considerable stretch as to its true meaning particularly when there is no evidence, other than his boorish behavior, of a previous request for sexual favors either overt or implicit.

**V. RETALIATION**

Plaintiff alleges that she complained both to CARRO and MUCHACHO, her two former supervisors, of the alleged sexual harassment she was subjected to by VIERA and that as a result thereof she was given a performance improvement plan (probation letter) and was eventually terminated.

Title VII proscribes retaliation by an employer based on an employee's complaint of discriminatory practices. 42 U.S.C. § 2000e(3)(a). A prima facie retaliation showing requires that plaintiff present evidence that: (1) she engaged in Title VII

protected conduct; (2) experienced a materially adverse employment action in that it "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination"; and (3) there is a causal connection between the protected conduct and the ensuing adverse action. Burlington Northern & Santa Fe Ry. Co. v. White, ___ U.S. ___, 126 S.Ct. 2405, 165 L.Ed.2d 345 (2006); Torres-Negron, 488 F.3d at 44; Noviello, 398 F.3d at 88; Che, 342 F.3d at 38; Dressler v. Daniel, 315 F.3d at 78; Gu v. Boston Police Dep't, 312 F.3d 6, 14 (1st Cir. 2002); Marrero v. Goya, 304 F.3d at 22.

It is imperative to bear in mind that this provision seeks to ensure absolute access to the Title VII grievance process. Hence, protection is limited to "retaliation that produces an injury or harm." Burlington Northern and Santa Fe Ry. Co. v. White, ___ U.S. ___, 126 S.Ct. 2405, 2414, 165 L.Ed.2d 345, 349 (2006). Thus, to be actionable, "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Id.*, 126 S.Ct. at 2416 (citation and internal quotation marks omitted).

"The alleged retaliatory action must be material, producing a significant, not trivial, harm. Trivial actions such as petty slights, minor annoyances, and simple lack of good manners will not [normally] create such deterrence. Context matters, and the standard is tied to the challenged retaliatory act, not the underlying conduct

that forms the basis of the Title VII complaint." Carmona v. Puerto Rico, 464 F.3d 14, 20 (1st Cir. 2006) (citation and internal quotation marks omitted, brackets in original).

Further, the employee's reaction will be examined from an objectively reasonable standard. "By focusing on the materiality of the challenged action and the perspective of a reasonable person in the plaintiff's position, we believe this standard will screen out trivial conduct while effectively capturing those acts that are likely to dissuade employees from complaining or assisting in complaints about discrimination." Burlington, 126 S.Ct. at 2416.

"Whether a particular [action] is materially adverse depends upon the circumstances of the particular case, and should be judged from the perspective of a reasonable person in the plaintiff's position, considering all the circumstances. *Id.* 126 S.Ct. at 2417 (citation and internal quotation marks omitted).

"Once the plaintiff has made a prima facie showing of retaliation, the *McDonnell Douglas* burden-shifting approach is employed, and defendant must articulate a legitimate, non-retaliatory reason for its employment decision. If the defendant meets this burden, the plaintiff must now show that the proffered legitimate reason is in fact a pretext and that the job action was the result of the defendant's retaliatory animus." Calero-Cerezo v. U.S. Dept. of Justice, 355 F.3d 6, 26 (1st Cir. 2004); Wright v. CompUSA, Inc., 352 F.3d 472, 478 (1st Cir. 2003); Che, 342 F.3d at 39.

Should the employer advance a legitimate reason for its decision, "the ultimate burden falls on the plaintiff to show that the employer's proffered reason is pretext masking retaliation...." Mesnick, 950 F.2d 816, 827 (1st Cir. 1991). "Upon the emergence of such an explanation, it falls to the plaintiff to show both that the employer's proffered reasons is a sham, and that discriminatory animus sparked its actions." Cruz-Ramos v. Puerto Rico Sun Oil Co., 202 F.3d at 384 (citation and internal quotation marks omitted).

The fact that the reasons proffered by the employer are discredited by plaintiff does not automatically mandate a finding of discrimination. "That is because the ultimate question is not whether the explanation was false, but whether discrimination was the **cause** of the [conduct at issue]. We have adhered to a case by case weighing. Nonetheless, disbelief of the reason may, along with the prima facie case, on appropriate facts, permit the trier of fact to conclude the employer had discriminated." Zapata-Matos v. Reckitt & Colman, Inc., 277 F.3d at 45 (citations omitted)(emphasis ours); Reeves, 530 U.S. at 147-48, 120 S.Ct. 2097, 147 L.Ed.2d 105.

Thus, summary judgment will be denied if once the court has reviewed the evidence submitted by the parties in the light most favorable to the plaintiff it finds there is sufficient evidence from which a trier of fact could conclude that the reasons adduced for the charged conduct are pretextual and that the true motive was discriminatory. Santiago-Ramos v. Centennial, 217 F.3d at 57;

Rodriguez-Cuervos v. Wal-Mart Stores, Inc., 181 F.3d 15. 20 (1st Cir. 1999).

In order for plaintiff to succeed in her retaliation claim she must prove that she was the object of an adverse action which would have dissuaded a reasonable person from advancing a discrimination claim.

**A. Probation Letter**

The letter placing plaintiff on probation itemized the areas plaintiff needed to improve in order to continue in defendant's employ. A specific work plan was designed to assist her in the process. At no time were plaintiff's position, salary, duties, and/or responsibilities affected as a result thereof. As a matter of fact, at the end of the three-month period plaintiff was found to have corrected the deficiencies cited[5] and kept on working in her usual job. Under these circumstances, we find that a reasonable person would not have found this challenged action to be materially adverse. Further, the memorandum was triggered by a May 13, 2002 e-mail from GUILLERMO RODRIGUEZ, a high-ranking BACARDI executive to CARRO complaining about plaintiff's performance and her handling of defendant's brands under her command.

Accordingly, even assuming plaintiff had timely filed her administrative charge for this event, we find that the probation

---

[5] In a letter dated October 3, 2002, comments describing her progress for each of the allegedly deficient areas were noted.

letter does not constitute and adverse action sufficient to establish a retaliation claim.

**B. Termination**

Assuming, *arguendo*, that plaintiff has met her initial burden of presenting a prima facie case of retaliation based on her termination due to her complaints of sex discrimination we shall examine whether defendant has articulated legitimate, non-discriminatory reasons for her dismissal.

According to defendant, the decision to dismiss plaintiff responded to the fact that she used a promotional concept created and developed by EMPIRE - an entity previously used by BACARDI for multiple promotions and events in the marketing of its "Bacardi Limon" brand - without EMPIRE's knowledge or consent. In other words, that plaintiff stole ("pirateo") EMPIRE's concept. Additionally, BACARDI cited plaintiff's ethical violation by having approached an EMPIRE employee to "free-lance" for BACARDI.

Plaintiff argues that the only evidence available of EMPIRE's ownership of the promotional concept was a March 28, 2003 document prepared subsequent to her termination. This is not correct. Defendant submitted a December 4, 2002 e-mail from CARLOS COBIAN, EMPIRE's Marketing Director, to CARRO making reference to a previous conversation and attaching documents evidencing that the "Bacardi Limon Drums" concept was EMPIRE's original idea dating back to a

presentation made in 2000 which had not been approved by BACARDI.[6] According to COBIAN, the idea had been resubmitted under the name "Bacardi Limon Drums" in March 2002, upon plaintiff's request for a new image promotion. Although the budget had been originally approved the promotion was cancelled a few months later. The e-mail further noted that it was not "until a few days ago" that EMPIRE learned that the promotion was going to be carried out by the BACARDI promotion team instead without EMPIRE's consent. The e-mail specifically noted that this incident would endanger the parties' professional relationship and future plans.

Plaintiff contends that even though the original marketing idea was suggested by EMPIRE in its promotional campaign she should not have been held accountable because the concept was partially developed by her; it was modified in its implementation and further, the decision to use it was not hers alone.

We agree with defendant that the version of the events surrounding this issue as proffered in plaintiff's affidavit in response to their summary judgment request must be disallowed inasmuch as it runs contrary to her prior deposition testimony and no explanation has been given for plaintiff's recanting. Accordingly, we shall examine the retaliation claim based on plaintiff's original account of the events.

---

[6] Copy of the presentation of the "Bacardi Limon Drums" concept as well as a cost estimate for its development and implementation were also submitted.

In her deposition plaintiff related that the "Bacardi Limon" sales were threatened at the time and it was imperative to increase them. [Tr. 161-62]. The BACARDI promotion employees were concerned because the product's presence on locations/premises had to grow. At that time plaintiff was called upon, as the product's manager, to provide promotional tools to implement in bars during the Christmas season because the Promotion Department had none available. According to plaintiff, this direct promotional approach in bars would be more effective in increasing sales than trying to work on the product's image as previously planned through the original EMPIRE campaign.

Plaintiff indicated that she proposed the EMPIRE concept to the BACARDI employees responsible for designing a marketing strategy for the bars. Plaintiff brought to their attention EMPIRE's existing program design which was adapted for use in bars. [Tr. 162]. Plaintiff testified that she was almost certain she made available EMPIRE's promotion materials to the group. [Tr. 164].

Even though plaintiff contends that the "Bacardi Limon Drums" idea was partially hers, in her deposition she concedes that EMPIRE owned the creative concept [Tr. 154]; the "name and the concept belonged to Empire" [Tr. 164] and that "[s]ome of the elements [of EMPIRE's proposal] were integrated" in the promotion [Tr. 154]. The name "Bacardi Drums" and the bottles filled with liquid was copied.

Plaintiff defends arguing that the "Bacardi Drums" presented under her aegis was different than the one proposed by EMPIRE because

it was used at a different type of venue, i.e., at bars rather than hotels/discotheques [Tr. 165] and drums were added to the concept [Tr. 168]. However, she testified that the campaign "did not change drastically, completely, but it changed." [Tr. 155]. We find that based on the record, there are sufficient similarities with the original idea as proposed by EMPIRE to reasonably raise a legitimate concern.

Plaintiff's attempt to diminish her role in the "Bacardi Limon Drums" promotional campaign eventually implemented fares no better. Regardless of how the idea was subsequently developed the undisputed evidence shows that it was plaintiff who suggested the use of the "Bacardi Drums" concept. "At that time when they tell [sic] me 'Cristina, you are the brand, we need you to give us tools for me to take to the bars in Christmas, I have nothing.' And I explained, 'We have this program.'" [Tr. 161].

As Brand Manager, plaintiff was responsible for designing, directing and developing the marketing strategies for the sale and marketing of the products assigned to her which included "Bacardi Limon". As such, it was reasonable to hold her accountable for the decision to use EMPIRE's concept. It is uncontested that it was plaintiff who submitted EMPIRE's idea to the Promotions Department in response to their request for a Christmas promotional idea.

EMPIRE's Marketing Director, CARLOS COBIAN also complained to JAVIER CARRO in December 2002, that plaintiff had approached INGRID

SEGARRA, an EMPIRE employee, to work on future BACARDI projects. Plaintiff defends arguing that she had been approached by SEGARRA who had purportedly resigned from EMPIRE and that she had relayed the information of her availability to VIERA. However, it is undisputed that BACARDI was faced with a complaint from its business associate dealing specifically with this matter.

It is important to note that the court's role is not to judge whether personnel decisions are correct or wise.  Our function is limited to determining whether indeed plaintiff's termination was prompted in retaliation for her alleged sex discrimination complaints. "Federal courts do not sit as a super-personnel department that reexamines an entity's business decisions. No matter how medieval a firm's practices, no matter how high-handed its decisional process, no matter how mistaken the firm's managers, the ADEA does not interfere." González v. El Día, Inc., 304 F.3d at 69 (internal brackets and quotation marks omitted). *See also*, Wolf v. Buss Inc., 77 F.3d 914, 920 (7th Cir. 1996) (court "does not sit as a super-personnel department that reexamines an entity's business decisions", the question is not whether employer "exercised prudent business judgment," but whether plaintiff has refuted "articulated, legitimate reasons" for employment decision).

Consequently, the dispositive issue in this case is not whether defendant used poor judgment in its decision to discharge plaintiff but whether it honestly believed its own reason for firing her. *See*,

Loyal v. Hasbro, Inc., 380 F.3d 14, 19 (1st Cir. 2004) (relevant inquiry whether reason given by the employer is the real reason for its action and whether decision was based on discriminatory motive instead).

Plaintiff has not shown that BACARDI's reasons for her termination were false or a pretext for retaliation. The failure to create a triable issue of fact concerning plaintiff's retaliatory termination claim warrants its dismissal.

**VI. LAW 80**

Additionally, plaintiff seeks relief under Law 80, also known as Puerto Rico Wrongful Discharge Act. This statute seeks to protect individuals in their employment by requiring employers to indemnify them if discharged "without just cause". P.R. Laws Ann. tit. 29, § 185a. Pursuant to Law 80, a dismissal without just cause is "[one] made by mere whim or fancy of the employer or without cause relative to the normal operation of the establishment." § 185b. The employee's improper conduct, poor job performance as well as violation of the employer's policies are deemed "good cause" for dismissal under the statute. § 185b. *See also*, Figueroa Garcia v. Lilly del Caribe, Inc., 490 F.Supp.2d 193, 213 (D.P.R. 2007) ("statute allows termination for a number of reasons related to the employee's job performance including an employees' improper and disorderly conduct, negligent attitudes toward her work, and violations of the employer's policies.")

Further, the statute does not seek to limit "just cause" to the particular situations listed in the statute. Rather, these constitute mere examples of behavior found to run contrary to the orderly functioning of a business enterprise which merit dismissal. Srio. del Trabajo, 153 D.P.R. 223, 244 (2001).

"Although Law 80 generally refers to multiple episodes of misconduct as constituting good cause, Law 80 does not invariably require repeated violations, particularly where an initial offense is so serious, or so reflects upon the employee's character, that the employer reasonably should not be expected to await further consequences." Hoyos v. Telecorp Commc'n, Inc., 488 F.3d 1, 6 (1st Cir. 2007) (citation and internal quotation marks omitted). Srio. Cel Trabajo v. G.P. Indus., Inc., 153 D.P.R. at 244-45.

The burden falls on the employer to prove that it had just cause for the termination. § 185k. "[O]nce an employee proves that he was discharged and alleges that his dismissal was unjustified, his employer must establish by a preponderance of the evidence that the discharge was for good cause." Hoyos, 488 F.3d at1, 6. *See also*, Alvarez-Fonseca v. Pepsi Cola of P.R. Bottling Co., 152 F.3d 17, 28 (1st Cir. 1998).

We find that based on the foregoing, there was just cause for plaintiff's termination given her role in the use of EMPIRE's promotional concept.

**VII. SUPPLEMENTAL CLAIMS**

The Court having dismissed the federal-based causes of action, plaintiffs' remaining state law claims are hereby **DISMISSED WITHOUT PREJUDICE.** McGee v. Delica Co., Ltd., 417 F.3d 107 (1st Cir. 2005); Gonzalez v. Family Dept., 377 F.3d 81, 89 (1st Cir 2004).

**VIII. CONCLUSION**

Based on the foregoing, Bacardi's Motion for Summary Judgment (docket No. **14**)[7] is disposed of as follows:

The request to dismiss the hostile environment and retaliation claims is **GRANTED.**

The request to dismiss the unjust termination claim based on Law 80 is **GRANTED.**

The remaining local claims asserted under our supplemental jurisdiction are **DISMISSED WITHOUT PREJUDICE.**

Judgment shall be entered accordingly.

IT IS SO ORDERED.

San Juan, Puerto Rico, this 12th day of October, 2007.

S/Raymond L. Acosta
RAYMOND L. ACOSTA
United States District Judge

---

[7] *See also*, Opposition (docket No. **27**); Reply (docket No. **33**) and Sur-Reply (docket No. **43**).